Filed 7/16/25  P. v. Dollar CA6

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>RICHARD MORRIS DOLLAR,<br><br>　　Defendant and Appellant. | H050414<br>(Santa Clara County<br>Super. Ct. No. 123352)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on June 24, 2025, be modified as follows:

1. On page 6, footnote 6, the second sentence starting with "At trial, however…" is replaced with the following sentence:  On direct examination, Pape attributed these statements solely to Dollar.  But impeached on cross-examination with his preliminary hearing testimony (attributing similar statements to Hodges and Stevenson), Pape said variously that counsel was confusing him, that Dollar made the statements to Pape, that Hodges and Stevenson made comparable statements in another conversation, and that Dollar only referred to Hoffman as a 'punk' or 'pussy' without opining on the reason Hoffman was killed.  Although the testimony on this point is conflicting, we must view the evidence in the light most favorable to the judgment.  (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)"

2. On page 16, the first full sentence starting with "As no such declaration…" is replaced with:  "As no such declaration has been submitted—and Dollar

himself was not only present during the entirety of the original trial and cross-examination of Cathi but would have later, either personally or through counsel, been in possession of the trial transcript to pursue his direct appeal and habeas corpus petition (see *People v. Reese*, *supra*, 2 Cal.5th at p 664; *People v Gonzalez*, *supra*, 7 Cal.App.3d at p. 166)—he has failed to meet his burden to show prejudice from counsel's omissions. (*Strickland*, at p. 694.)"

There is no change in judgment.

The petition for rehearing is denied.

_____

LIE, J.

_____

DANNER, Acting P. J.

_____

BROMBERG, J.

*People v. Dollar*
H050414

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD MORRIS DOLLAR,<br><br>    Defendant and Appellant. | H050414<br>(Santa Clara County<br>Super. Ct. No. 123352) |

On the Fourth of July in 1978, Gus Henry Hoffman was last seen riding his motorcycle before he disappeared.  Around 12 years later in 1990, appellant Richard Morris Dollar and two codefendants were convicted of first degree murder (Pen. Code, § 187)[1] of Hoffman and were sentenced to life in prison with the possibility of parole.  The prosecution's theory of the case was that Dollar and his codefendants killed Hoffman after conspiring to steal his motorcycle.

In 2021, Dollar petitioned for resentencing under section 1172.6, alleging that he can no longer be convicted of murder under current law, which the trial court denied following an evidentiary hearing.  On appeal, Dollar argues the trial court erred by admitting a partial transcript of a key witness's trial testimony, there was insufficient evidence that he was a major participant who acted with reckless indifference to human

---

[1] Unspecified statutory references are to the Penal Code.

life or that he was a direct aider and abettor to murder, and the court exhibited judicial bias when it copied nearly verbatim the prosecutor's brief into its order denying relief. Finding no error, we affirm.

## I.     BACKGROUND

### A.     *Dollar's Conviction, Sentencing, and Postjudgment Proceedings*

In 1988, the Santa Clara County District Attorney filed an information charging Dollar with murder (§ 187) and alleging the special circumstances that the murder was committed during an attempted robbery and kidnapping (former § 190.2, subd. (c)(3)(i) & (ii)) and that the murder involved the infliction of torture (former § 190.2, subd. (c)(4)).

In 1990, a jury convicted Dollar and two codefendants, Michael Allen Hodges and Jon Michael Stelle, with the charged count of murder and found both special circumstances true as to all defendants. Upon the defendants' motions, the trial court struck the special circumstances findings in the furtherance of justice under section 1385 and alternatively on the basis of insufficiency of the evidence.[2] The trial court then sentenced Dollar to life in prison with the possibility of parole. On direct appeal from Dollar's judgment of conviction, this court affirmed the judgments as to all defendants in an unpublished opinion. (*People v. Dollar et al.* (Apr. 2, 1993, H007781) [nonpub. opn.].)

Several years later, Dollar filed a writ of habeas corpus before this court seeking to set aside his conviction on multiple grounds, including the discovery of a new witness, Leah King. This court issued an order to show cause returnable in the trial court and in 1993, the trial court conducted an evidentiary hearing on the issues and denied Dollar's

---

[2] In arguing for the dismissal of the special circumstances, counsel for all three codefendants argued in part that there was no evidence that the codefendants were present when Hoffman was killed.

writ petition.  Dollar filed another writ of habeas corpus with this court reiterating the same claims, which this court denied in 1996.

In May 2021, Dollar filed a petition for resentencing under section 1172.6, alleging that he could no longer be convicted of murder under current law.  The trial court issued an order to show cause and set the matter for an evidentiary hearing.

**B.** ***The Evidentiary Hearing on the Section 1172.6 Petition***

At the evidentiary hearing, the trial court reviewed and considered several exhibits, including a partial record from Dollar's 1990 jury trial, the record from the 1993 evidentiary hearing on his habeas corpus petition, the transcripts from his 2014 parole hearing, and this court's decisions on Dollar's direct appeal and habeas corpus petition, which were both considered solely for the summary of the case's procedural history.  No live testimony was presented.

**1.** ***The 1990 Trial***

**a.** ***Hoffman's Disappearance***

Twenty-year-old Gus Hoffman was last seen on July 4, 1978.  A neighbor who lived across the street from Hoffman's family saw Hoffman depart for a family picnic on his motorcycle shortly after 4:00 p.m.  Another neighbor recalled Hoffman riding his "beautiful show bike" that day alongside two motorcycles and a dark blue Monte Carlo. The other motorists seemed to be "after" Hoffman.  One motorcyclist looked like he was swinging a chain toward Hoffman.  A former gas station attendant who knew Hoffman recalled seeing him talking to two motorcyclists, one of whom the attendant recognized as Michael Stevenson.  Hoffman never returned home, and his body was never recovered.

### b. *Dollar's Involvement in Hoffman's Murder*

At trial, evidence of Dollar's involvement in Hoffman's murder came largely from the testimony of Cathi McClintock,[3] who in 1978 had been married to Dollar. Cathi's credibility was a principal point of dispute at trial; Cathi ended her relationship with Dollar after she found him in bed with another woman. Cathi acknowledged multiple inconsistencies in her prior accounts of the crime. Several witnesses testified to Cathi's hostility to Dollar and desire for revenge, including one witness who testified that Cathi asked him to break Dollar's legs.

Cathi testified that on July 4, 1978, she and Dollar were driving to Stevenson's house in a blue Monte Carlo with Daniel Donnan, Stevenson's sister, and Stelle, joined by Stevenson and Hodges on motorcycles. On the way, Cathi noticed a third motorcyclist, and it looked like all three motorcyclists were talking. At Stevenson's house, she saw Dollar and Stevenson walk the third motorcyclist into the garage with their arms around the man's shoulder. The man looked scared. Hodges brought the man's motorcycle into the garage, closing the garage door. Stevenson's sister and Cathi went into the house.

Cathi heard what sounded like people hitting someone in the garage and saw Dollar briefly enter the house and head back to the garage with a jar of Vaseline. When she asked what the Vaseline was for, Dollar answered, "This is where the fun begins." He made Cathi join him in the garage and had her sit. Cathi saw Stelle, Stevenson, Hodges, Dollar, and a man who she later recognized as Hoffman.

Hoffman looked as if he had been hit in the face. Cathi tried to leave, but Dollar warned her not to get up and used Hoffman's belt to bind her hands. Dollar took Hoffman's pants off, while Stevenson restrained Hoffman's arms. Hoffman asked Cathi

---

[3] McClintock's surname has changed several times since 1978. For clarity, we refer to her by her first name, intending no disrespect.

to help him, but someone stuffed a piece of laundry into his mouth. Dollar, Hodges and Stevenson anally raped Hoffman. Hoffman was also forced to orally copulate Dollar, Hodges, and Stevenson.

When Cathi was allowed to leave the garage, Hoffman was still alive. Dollar threatened that if Cathi told anyone what had happened, she would get the same treatment as Hoffman and her sister and her mother "would die." Dollar also said he would make sure that she went to prison with him—"for murder"—because she had been inside the garage.[4]

Cathi went home. She later heard Dollar and Stelle return, and Stelle asked Leslie Robb for the keys to her car.

When Cathi next saw Dollar, he told her that Hoffman "was beat to death" and that Dollar would likewise "torture" her if she told anyone. Dollar said that Stelle had cut up Hoffman's body and "they had [it] in garbage bags." Dollar added that he now had a motorcycle.[5]

Cathi's mother Shirley recalled that on July 4, 1978, Cathi returned home around 3:00 p.m. and seemed upset. Dollar came back in the late afternoon or early evening. Shirley thought Dollar looked "wild eyed," and he told her, "Mom, I just got me a motorcycle." But Shirley never saw Dollar with a motorcycle in the months after July 1978.

A few months after July 4, 1978, Cathi's brother John Noel Pape was with Dollar when they saw a poster about Hoffman's disappearance. Dollar looked at the poster and

---

[4] At trial, Donnan testified that he saw a total of three motorcyclists that day and upon arrival back at Stevenson's house he had tried to enter the garage but was stopped by Stevenson.

[5] Cathi's mother Shirley later testified that at the time, her husband James Rathbun was in the business of manufacturing methamphetamine. As members of the Rathbun family share the same surname, we refer to them by their first names for clarity.

said, "There is that fucking punk right there," "He couldn't take an ass whipping" and he "wouldn't hold his mud so he had to die."[6]

### 2. *The 1993 Evidentiary Hearing*

Postjudgment, Dollar petitioned for writ of habeas corpus alleging that a new witness, Leah King, refuted Cathi's testimony and established his innocence. King had been at Stevenson's house near the time of the murder and had experienced Stevenson's violent and abusive proclivities, but she had not seen Dollar there. Granted an evidentiary hearing, Dollar also presented evidence of Stevenson's other violent acts, but the parties' focus was on the testimony of King and Cathi.

### a. *Leah King's Account*

In the summer of 1978, Shirley Rathbun invited then 14-year-old King to a party around July 4 and introduced her to Stevenson as a friend of King's recently deceased father. On Shirley's assurance that she "couldn't be in any better hands," King agreed to go with Stevenson to a motel where she thought he was to buy cocaine. Instead, he raped her.

Stevenson brought King to his house late that evening between 10:00 p.m. and midnight. King thought she heard screaming, and when she was later summoned to the garage, saw Stevenson cleaning off what looked like a knife. She saw Hodges and another man in the garage, and a body she later identified as Hoffman on the floor.

---

[6] Testifying at trial, Pape attributed these statements solely to Dollar. At trial, however, it was disputed whether Pape may have misattributed to Dollar statements by either Hodges or Stevenson based on his prior testimony at the preliminary hearing. Pape did not initially understand Dollar's reference to "mud" in context, although "mud" was a familiar term in their "environment." At trial, Pape took "wouldn't hold his mud" to mean that Hoffman had defecated on himself while being sodomized. At the 1993 evidentiary hearing, however, another witness recalled a still more figurative usage of this expression: after submitting to a severe beating by Stevenson and others (while Dollar was present at some point, at a minimum) in retaliation for what the assailants considered a transgression, Stevenson acknowledged the witness's ability to "hold [his] mud" when the witness refuse to apologize despite being "beat up for hours."

6

Hoffman looked like had been beaten and stabbed and did not appear to be conscious as he was being covered by a plastic garbage bag. Hodges and the other man loaded the body into a car trunk, and Stevenson told them to clean up. Stevenson handed King several items and asked her to burn them in the fireplace. King did not recall Dollar being present and opined that Dollar was innocent. But she did not see when or how Hoffman was brought into the garage or how long he had been there.

The next day, King went with Stevenson on his motorcycle to a cabin in the mountains. The two men King had seen the day before in Stevenson's garage were there, muddy, with shovels. King overheard Stevenson ask if the men were certain "they got him more than six feet under."

King stayed with Stevenson for two or three days, essentially imprisoned within his house, until Cathi came and took her away. King told Cathi and later Shirley about Stevenson's sexual abuse, but she did not tell either of them about the dead person she had seen in Stevenson's garage. A few days later, King told Cathi's sister Jodi that Stevenson and others had beaten and killed someone in the garage, put the body in garbage bags, and buried the body in the mountains.

Later, Stevenson took King to a house associated with the Hell's Angels where she was sexually abused and injected with drugs for another two weeks. King escaped and returned home with assistance of a former employer. King's mother recalled King confiding that she had been sexually assaulted and had witnessed a murder. Victoria Terrell recalled that Stevenson had stayed at her Boulder Creek cabin sometime after May 1978 and once brought a young girl who said her father had recently died. Terrell later learned that Stevenson had also brought a body in the trunk of the car he arrived in.

### b. Cathi's Account

Having reviewed King's declaration, Cathi reaffirmed that she had been present in the garage when Hoffman was sexually assaulted. Cathi was unsure what time she and Dollar were at Stevenson's house that day, but it was still light outside when they arrived

7

and when she left. And it was dark when Stelle and Dollar came back to the Rathbun home.

Cathi reiterated that she had told the police that Hoffman's body had been transported in green garbage bags to an unknown location that Dollar later told her was a Hell's Angels burial ground.

Cathi said she had met King only once, had never spoken to King, and had never taken her away from Stevenson's house.

Shirley testified that about a week after July 4, 1978, Robb told her that Dollar and Stelle had used Robb's car to dispose of Hoffman's body. Shirley's husband told her that Dollar had "done something terrible."[7] And when the posters about Hoffman's disappearance were placed around town, her husband said of them, "That is what your son-in-law did." Her husband also once asked Shirley, "[C]an you believe that there was a body in that house," which Shirley understood to be a reference to Hoffman. In 1980, Cathi told Shirley that she had to witness Hoffman being tortured at Stevenson's house.

Cynthia Perron, another one of Cathi's siblings, recalled someone telling her that Cathi had been present when someone was killed.

### 3. *Dollar's Parole Hearing Testimony*[8]

At his 2014 parole suitability hearing, Dollar admitted he punched, pushed, belittled, and "took advantage of" Hoffman in Stevenson's garage but denied being

---

[7] At trial, Cathi testified that when Dollar told her about Hoffman's killing and disposal of the body, he said he planned to discuss what happened with Cathi's stepfather.

[8] "It is well settled that a defendant's . . . testimony at a parole hearing fall within the ambit of ' "new or additional evidence." ' " (*People v. Zavala* (2024) 105 Cal.App.5th 366, 373; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 586; *People v. Myles* (2021) 69 Cal.App.5th 688, 703; but see *Mitchell*, *supra*, 81 Cal.App.5th at p. 596, (dis. opn. of Stratton, P. J.) [finding that use of parole hearing testimony violated judicial rule of exclusion set forth under *People v. Coleman* (1975) 13 Cal.3d 867].) Dollar on appeal does not challenge the trial court's consideration of his parole hearing testimony.

present when Hoffman was killed. Hoffman was still conscious when Dollar left him in the garage. But Dollar was "drunk and loaded" and did not remember the night well. He did not go back into the garage that night and eventually went home with Cathi.

Asked about the jar of Vaseline, Dollar said he would "accept that as, that's what is written" in the police report. Explaining the point at which the Vaseline "took place," Dollar said, "[W]hen I was continuing assaulting him, that was when that took place. [¶] . . . [¶] . . . I pulled down his pants [and underwear] and whacked him on the ass and told him[, ']you're weak.['] "

Around midnight or 1:00 a.m., Shirley sent Dollar to drive a car back to Stevenson's house for Stelle and Hodges. He backed the car into the garage at Stelle's direction, and a body he believed to be Hoffman's was loaded into the trunk. Together with Stelle, Hodges, and "Donham," Dollar drove to the Santa Cruz mountains. He asked no one about what had happened to Hoffman; he only "popped the trunk" when he arrived and did not help move the body, though he believed that "Donham" ended up with Hoffman's motorcycle.

Dollar did not recall telling Cathi how the body was dismembered and put in trash bags, but it "could be true" or he could have made up the statements to terrorize her.

When asked if he was "innocent of what [he was] convicted of," Dollar answered no and affirmed that he had been convicted of "murder." Asked what he did to be guilty of murder if he had only "punched [Hoffman] once," Dollar explained: "Well, I, I punched him and showed him to be weak in front of those people, that I, I should have known something was going to happen to him. I should have stopped." Dollar admitted that when Hoffman "was down," he "pulled his pants off" and "continued to abuse him." Dollar said variously that he "didn't stop what [he] knew was going to happen afterwards," that he had not considered it likely that Hoffman would be killed, and that he "later" considered this a possibility. Dollar said he thought something bad would happen to Hoffman, but he thought the men would only beat Hoffman more and take his

9

motorcycle. Dollar reasoned that he had "dealt with people like that all [his] life" and that he himself had "got beat up . . . over things like" being late paying debts.

Although Dollar denied sodomizing Hoffman, he said he would "accept" what was written in the police report as "the truth of the matter."

## C.    *The Trial Court's Order*

In July 2022, the trial court denied Dollar's section 1172.6 petition in a lengthy written order that closely tracked the factual recitation from the prosecution's brief. The trial court rejected the idea that King's credibility either demonstrated or compelled the trial court to reject Cathi's testimony about what happened in the garage, reasoning that "King's arrival in Stevenson's house roughly two hours after Cathi and [Dollar] would have arrived" would not have precluded either Cathi's or Dollar's presence in the garage. The trial court held that Dollar was either a direct aider and abettor to murder or was a major participant in the underlying robbery who acted with reckless indifference to human life.

## II.    DISCUSSION

### A.    *Sufficiency of the Evidence*

Convicted of murder before amendments to the murder law effective January 1, 2019, eliminated imputed malice theories (Sen. Bill No. 1437 (2017–2018 Reg. Sess.) (Sen. Bill 1437)), Dollar would be entitled to vacatur of his murder conviction and for resentencing unless the prosecution proved beyond a reasonable doubt that he remains guilty of murder under current law. (§ 1172.6, subd. (d)(3); *People v. Curiel* (2023) 15 Cal.5th 433, 448.) We review the trial court's denial of Dollar's section 1172.6 petition for resentencing following an evidentiary hearing for substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) "Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid

10

value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Ibid.*)

### 1. *Admission of Cathi's Trial Testimony*

Because Cathi's testimony was critical to the denial of resentencing, we first consider Dollar's argument that the trial court erred by admitting Cathi's trial testimony at the evidentiary hearing because the record omits significant portions of her cross-examination, violating his right to confront witnesses. The trial transcripts submitted by the prosecution and considered by the trial court includes her cross-examination by codefendant Hodges and the portion of the cross-examination Stelle's counsel completed on June 11, 1990, before the court recessed until the next morning, at page 6106 of the trial record. But the next admitted transcript begins with the court greeting the jury the afternoon of June 14, 1990, at page 6624, with no mention of any unscheduled interruptions of the trial. Thus, about 500 pages of trial proceedings that would have presumably included the remainder of Cathi's testimony was not offered by the prosecution.

But as Dollar himself concedes, his trial counsel made no objections below when the prosecutor sought to admit the trial transcripts, which included Cathi's incomplete trial testimony. Dollar's failure to object to the admission of the trial transcripts forfeited his claims of evidentiary error on appeal. (Evid. Code, § 353, subd. (a); *People v. Seumanu* (2015) 61 Cal.4th 1293, 1313 [failure to object on hearsay grounds forfeits issue on appeal]; *People v. Redd* (2010) 48 Cal.4th 691, 730 [failure to object on confrontation clause grounds forfeits claim on appeal].)

Dollar, however, argues that his trial counsel rendered ineffective assistance should his challenges to Cathi's trial testimony be deemed forfeited. To prevail on a claim of ineffective assistance of counsel, Dollar must establish both that his counsel's performance was deficient and that the deficiency prejudiced him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) To show deficient performance, he

must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) And to establish prejudice, a "defendant must show that there is a reasonable probability"—"a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) When a claim of ineffective assistance is raised on direct appeal, the California Supreme Court has "repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 (*Mendoza Tello*).)

There is a satisfactory explanation for counsel's failure to object to the partial trial transcripts here. (See *Mendoza Tello*, *supra*, 15 Cal.4th at p. 266.) We agree that admission of testimony from a prior hearing as used in the resentencing statute contemplates one in which the defendant had an opportunity to cross-examine the declarant. (§ 1172.6, subd. (d)(3) [admission of evidence governed by Evid. Code]; see *People v. Ocobachi* (2024) 105 Cal.App.5th 1174, 1181–1182; Evid. Code, § 1291, subd. (a)(2) [former testimony not made inadmissible under hearsay rule if, among other requirements, the party against whom the evidence is offered had the "opportunity to cross-examine the declarant with an interest and motive similar to that" of the trial]; see *People v. Ng* (2022) 13 Cal.5th 448, 539.) And under the Sixth Amendment's confrontation clause, the prior testimony is admissible if " 'the party against whom the prior testimony is offered had an appropriate opportunity for cross-examination at the prior hearing.' " (*Id.* at p. 544, italics omitted.)

Although it is the proponent of the evidence—here, the prosecution—that typically bears the burden of proving preliminary facts affecting the evidence's admissibility, the standard of proof of these foundational facts is typically a

preponderance of the evidence.  (See *Berroteran v. Superior Court* (2022) 12 Cal.5th 867, 898 [proponent of admission bears burden of proof for requirements to admit former testimony under Evid. Code, § 1291]; *People v. Cottone* (2013) 57 Cal.4th 269, 286 ["[t]he general rule is that preliminary fact determinations affecting the admissibility of evidence . . . are subject to proof by a preponderance of the evidence unless otherwise provided by law"].)  And here, counsel may have reasonably determined that the prosecution could have easily met its burden (albeit circumstantially) of demonstrating Dollar's opportunity to cross-examine Cathi at trial:  The trial transcripts reflect no ruling precluding cross-examination; Cathi was in fact cross-examined by counsel for the two other codefendants; and Dollar's counsel cross-examined other witnesses.

Moreover, Dollar had a Sixth Amendment right to cross-examine adverse witnesses at his trial, and he would have been entitled to the exclusion of Cathi's testimony *if* she had suddenly become unavailable for cross-examination.  (See *People v. Noriega* (2015) 237 Cal.App.4th 991, 1000 [when a witness is unavailable for cross-examination, " 'the conventional remedy is to exclude the witness's testimony on direct' "].)  But Dollar, represented by counsel on direct appeal and on habeas corpus as at trial, raised no confrontation clause claim despite the prosecution's reliance on Cathi's direct examination testimony.  To the contrary, this court in affirming the conviction on direct appeal noted the extent of Cathi's cross-examination.[9]  (§ 1172.6, subd. (d)(3) [trial court "may also consider the procedural history of the case recited in any prior appellate

---

[9] Dollar would as a matter of right have been afforded a full trial transcript at no cost, in litigating both his direct appeal and his habeas corpus petition.  (See *People v. Reese* (2017) 2 Cal.5th 660, 664 ["[t]he federal Constitution guarantees indigent criminal defendants a free transcript of trial proceedings for their defense"]; *People v. Gonzalez* (1970) 7 Cal.App.3d 163, 166 [defendant filing a habeas corpus petition would be entitled to a transcript upon proper showing of their need].)  Indeed, during Cathi's examination at the 1993 evidentiary hearing, it appears that Dollar's counsel asked her multiple times about aspects of her trial cross-examination that the prosecution at resentencing did not have.

13

opinion"].)  Counsel does not render ineffective assistance by failing to make an objection reasonably deemed futile.  (*People v. Price* (1991) 1 Cal.4th 324, 387.)[10]

Given the circumstantial evidence that Dollar indeed had the opportunity to cross-examine Cathi at the original trial, the admission of Cathi's testimony at the section 1172.6 hearing did not violate the Sixth Amendment.  So we focus not on whether counsel should nonetheless have sought the wholesale exclusion of Cathi's prior testimony but on whether counsel should have gone to greater lengths to procure a complete transcript of Cathi's cross-examination and offer it in evidence under Evidence Code section 356's rule of completeness:  "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party."

The record does not affirmatively demonstrate what efforts defense counsel made to obtain the full transcript for the evidentiary hearing; defense counsel's trial brief merely stated without further comment that "[w]e do not have the portion of the 1990 trial transcript" containing certain of Cathi's statements.  But counsel also noted that habeas counsel's extensive quotation of Cathi's testimony at the evidentiary hearing were undisputed and presumed correct.  Counsel could have reasonably concluded that the available evidence sufficiently impeached Cathi's credibility.  The trial transcripts reflect that Hodges's counsel spent several days cross-examining Cathi, questioning her on her

_____

[10] Relying on *People v. Brock* (1985) 38 Cal.3d 180, Dollar argues that the proponent of former testimony *must* include transcripts of cross-examination to comply with Evidence Code section 1291, as otherwise there would be no way to adequately assess the prior opportunity for cross-examination.  But *Brock* does not stand for this proposition:  in *Brock* the California Supreme Court found that the record reflected that the witness's significantly impaired physical condition at the time of the preliminary hearing severely handicapped the defendant's ability to cross-examine her.  (*Brock*, at pp. 196–198.)  The California Supreme Court thus held that the transcript was improperly admitted under Evidence Code section 1291. (*Brock*, at p. 198.)  " '[C]ases are not authority for propositions not considered.' "  (*People v. Avila* (2006) 38 Cal.4th 491, 566.)

14

prior inconsistent statements.[11]  And the full transcript of the 1993 evidentiary hearing on Dollar's petition for habeas corpus was also presented to the trial court at resentencing, where Dollar not only presented King's testimony but examined Cathi at length about her trial testimony.  " '[W]hether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation.' "  (*People v. Bolin* (1998) 18 Cal.4th 297, 334.)  Accordingly, Dollar has not met his burden on appeal to demonstrate that counsel's performance at resentencing "fell below an objective standard of reasonableness."  (*Strickland*, *supra*, 466 U.S. at p. 688.)

Dollar has also failed to meet his burden on the second prong of *Strickland*, in that he has not shown it to be reasonably probable that, absent counsel's omission, he would have received a more favorable result.  (*Strickland*, *supra*, 466 U.S. at p. 694.)  As we have explained, absent a constitutional bar to the admission of Cathi's prior testimony, Dollar's avenue for challenging it at the evidentiary hearing would have been to admit those portions of her trial testimony on cross-examination that might have contextualized the significance of the trial testimony admitted in the prosecution's case.  Dollar on appeal does not identify what evidence may have been elicited had the entirety of Cathi's cross-examination been admitted into evidence.  Dollar also had an ample basis to challenge Cathi's credibility based on the cross-examination by his codefendants and there is nothing in the record before us that would permit us to assume that Dollar's counsel, who cross-examined Cathi last, would have elicited anything more damaging to her credibility.  "[I]neffective assistance of counsel claims 'must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused.' "  (*People v. Watts* (2018)

---

[11] For example, Hodges's counsel pressed Cathi on whether she had only started saying that Dollar threatened her by saying she could be liable for "murder" when she started testifying against the three men in legal proceedings.

15

22 Cal.App.5th 102, 118.) As no such declaration has been submitted—and Dollar himself was not only present during the entirety of the original trial and cross-examination of Cathi but later in possession of the trial transcript—he has failed to meet his burden to show prejudice from counsel's omission. (*Strickland*, at p. 694.)

### 2. *Felony Murder*

Under the current iteration of the felony-murder statute, an accomplice to the commission of an enumerated felony that results in death may be liable for murder if the accomplice was a major participant in the underlying felony and acted with reckless indifference to human life. (§ 189, subd. (e).)[12] "It is undisputed that when Senate Bill 1437 amended Penal Code section 189 to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements elucidated in [*People v. Banks* (2015) 61 Cal.4th 788 (*Banks*)] and [*People v. Clark* (2016) 63 Cal.4th 522 (*Clark*)]." (*People v. Strong* (2022) 13 Cal.5th 698, 710.)

On appeal, Dollar argues that the trial court erred by denying his petition for resentencing because insufficient evidence supports the court's findings that he is guilty of murder under a felony murder theory as a major participant who acted with reckless indifference to human life. He relies largely on conflicts in the evidence, however, and the putative improbability of Cathi's rendering of the events, neither of which overcome the substantial evidence in support of the determination that he was a major participant in the robbery of Hoffman and acted with reckless indifference for Hoffman's life.

---

[12] The felony-murder rule applies only if a death occurs during the perpetration of certain enumerated felonies, such as a robbery. (§ 189, subds. (a) & (e).) As a threshold matter, it was the prosecution's burden to prove that Hoffman was killed during the perpetration of a robbery to establish liability under the felony murder rule. (§ 1172.6, subd. (d)(3) [prosecutor bears burden at evidentiary hearing].) Here, the trial court expressly found that Hoffman's death occurred during the perpetration of the robbery of his motorcycle, and Dollar does not appear to dispute the sufficiency of the evidence to support this conclusion.

16

### a. *Major Participation*

Whether an accomplice is a major participant in the underlying felony turns on circumstances including: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.) The Supreme Court has clarified that "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient," and that all the factors may be weighed to determine whether the defendant was a major participant. (*Ibid.*) Analyzing these *Banks* factors and viewing the judgment in the light most favorable to the prosecution, we find substantial evidence supports the trial court's conclusion that Dollar was a major participant in the underlying felonies.

We recognize that certain of the *Banks* factors weigh neither against nor for a finding of major participation. There is no substantial evidence that Dollar had any role in supplying or using lethal weapons. King described Hoffman as having been stabbed, but she did not witness the actual assault, and his body was never recovered.

Yet there is substantial evidence that Dollar was a major participant in the robbery of Hoffman. There was direct testimony that it was Dollar and Stevenson who initially induced Hoffman to enter the garage and that Dollar initially intended to take possession of Hoffman's motorcycle.[13] There is also substantial evidence that Dollar took part in

---

[13] In its order, the trial court characterized Dollar as "heavily involved" in the planning of Hoffman's robbery, but the circumstantial evidence that Dollar was involved in planning the robbery did not establish the *degree* of his involvement. Substantial

and, by reasonable inference, planned the sexual and physical assault while Hoffman was trapped in Stevenson's garage. Cathi's trial testimony was that Dollar, beyond escorting the frightened Hoffman into the garage, anticipated the sexual assault by fetching the jar of Vaseline and sardonically forecasting that "[t]his is where the fun begins." Cathi further testified that it was Dollar who removed Hoffman's pants before Dollar and the other men anally raped him. Although Dollar at his parole hearing denied raping Hoffman, even there Dollar "accept[ed]" the contrary allegation in the police report as "the truth of the matter" and acknowledged that he initiated the assault against Hoffman by punching him, "took advantage" of him, and "humiliat[ed]" him by removing his pants off and striking him on the buttocks.[14]

There was also substantial evidence that Dollar was aware of the dangers posed by the nature of the crime and was sufficiently familiar with the past experience or conduct of the other participants to understand that the robbery of Hoffman would involve more than just the threat of violence. (*Banks*, *supra*, 61 Cal.4th at p. 803.) The evidence suggested that the physical and sexual assault on Hoffman was prolonged, with Cathi testifying that she heard the sounds of Hoffman being beaten before the gang rape she witnessed. (See *People v. Montanez* (2023) 91 Cal.App.5th 245, 273 (*Montanez*) ["warning signs that the crimes posed a serious risk of danger to the victims accumulated

---

evidence nonetheless supports the trial court's ultimate determination that Dollar was a major participant in the robbery and torture of Hoffman.

[14] In its order, the trial court found that Dollar's statement in the parole hearing that he had taken advantage of Hoffman was an unambiguous admission that he had sexually assaulted him. Although we differ from the trial court in our interpretation of Dollar's parole hearing testimony, it is nonetheless proper to consider his testimony as circumstantial corroboration of Cathi's testimony about his participation in raping Hoffman. Dollar during the parole hearing did not deny bringing Vaseline to the garage and further admitted to hitting Hoffman on his naked buttocks. The trial court could have reasonably credited Dollar's admission of the fact of his assault on the unclothed Hoffman while also crediting Cathi's description of the full extent of Dollar's assault.

as the crimes unfolded over the course of the approximately 23 minutes [defendant] was present at the scene].)  And Dollar himself acknowledged at his parole hearing that he knew that "something bad" would happen to Hoffman once he left because he had "dealt with people like that" in the past.

Although Dollar suggested that his own knowledge of his cohorts' propensity for violence was limited to his lifetime of dealing with biker culture and getting "beat up" by "[p]eople like that" for things like tardy payment of debts, the court had sufficient basis to disbelieve this aspect of Dollar's testimony:  Stevenson's notoriety for violence was established by King and other witnesses, and Dollar, though not a member of Stevenson's "Forgotten Few" motorcycle club, had mutual friends with Stevenson and knew him well enough to be a (voluntary) guest in Stevenson's home and entrusted with the transport of a murder victim.[15]

Furthermore, Cathi testified that Dollar, upon escorting her out of the garage, specifically threatened that if she said anything, he would make sure she would be liable for "murder" because she too had been in the garage.  Dollar's threat supports an inference that he knew—before Cathi left him and Hoffman at the scene—that Stevenson and the others were likely to kill Hoffman.  (Compare with *In re Miller* (2017) 14 Cal.App.5th 960, 976 [no evidence that defendant, who was in same gang as codefendant, had participated together in shootings, murder, or attempted murder]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 405 [no evidence of "petitioner's knowledge of . . . cohorts' likelihood of killing"].)

Dollar argues in part that the original trial court's posttrial dismissal of the two special circumstances—that the murder was committed during an attempted robbery and

---

[15] The evidence included testimony that Stevenson and Dollar were each friends with "Sleepy" Rathbun, Shirley's husband and Cathi's stepfather and that Dollar had witnessed at least one "terrible" beating Stevenson and others had inflicted on another friend in the Rathbuns' home.

kidnapping (former § 190.2, subd. (c)(3)(i) & (ii)) and that the murder involved the infliction of torture (former § 190.2, subd. (c)(4))—precludes a finding that he was present during the killing. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 398 (*Cooper*) [holding under former § 1170.95 that a trial court cannot deny resentencing relief "based on findings that are inconsistent with a previous acquittal when no evidence other than that introduced at trial is presented"]; see also *People v. Arnold* (2023) 93 Cal.App.5th 376, 385–386 (*Arnold*) [applying principles of issue preclusion].)[16] At the time of Hoffman's murder in 1978, the former section 190.2 special circumstances required a finding that the defendant be " 'personally present during the commission of the act or acts causing death.' " (*Carlos v. Superior Court* (1983) 35 Cal.3d 131, 144, fn. 12, overruled in *People v. Anderson* (1987) 43 Cal.3d 1104, 1147.) But a finding of major participation in the underlying felony does not require a defendant's personal presence at the scene of the killing. The factor that weighs in favor of a finding of major participation is whether the nature of Dollar's participation put him in a position to anticipate or prevent the murder. (*Banks*, *supra*, 61 Cal.4th at p. 803; *Montanez*, *supra*, 91 Cal.App.5th at p. 279 [although the defendant was not at exact location of shooting, he was at the crime scene during the entirety of criminal activity, suggesting he had the ability to reduce risk to victim]; but see *In re Bennett* (2018) 26 Cal.App.5th 1002, 1024

[16] Both *Cooper* and *Arnold* are distinguishable from this case. In addition to the trial record, the trial court in this case was presented with additional evidence by way of the transcript of the 1993 evidentiary hearing on Dollar's habeas corpus petition and the 2014 parole hearing transcript. And at the parole hearing, Dollar testified that he instigated the assault on Hoffman and struck him several times, calling him names. Although Dollar's testimony on this point falls short of an admission that he was present when Hoffman was killed, the trial court could infer from his statements, combined with the evidence at his original trial and the 1993 evidentiary hearing, that he remained at Stevenson's house during the entirety of the assault. (Compare with *People v. Henley* (2022) 85 Cal.App.5th 1003, 1019–1020 [applying *Cooper* when new evidence presented at § 1172.6 evidentiary hearing addressed the issue sought to be precluded from relitigation at resentencing hearing].)

[no evidence that the defendant was "close enough [in] proximity to act as a restraining influence"].) And the finding that Dollar remained at Stevenson's house in a position to anticipate or prevent murder is not inconsistent with the original court's dismissal of the special circumstances under former law.[17]

The substantial evidence that Dollar was present in the garage for a protracted period while Hoffman was beaten and raped made it reasonable to infer that Dollar was in a position to prevent lethal violence, even if Dollar left before the fatal blow. Dollar recounted to Cathi that Hoffman had been "beat to death" and warned that if she told anyone she, like Hoffman, would be "torture[d]." Pape testified that Dollar on seeing a poster of Hoffman referred to Hoffman as "that fucking punk" who "couldn't take an ass whipping" and "wouldn't hold his mud so he had to die." A fact finder could infer that again, Dollar was reiterating first-hand knowledge of not just Hoffman's death but the murderous logic by which it became perceived as necessary. And there was further evidence of Dollar's proximity, as Shirley testified that her husband told her that Dollar had "done something terrible" while referencing Hoffman.[18]

Additionally, Cathi testified at trial that she went home after leaving the garage and at that time, Hoffman was still alive. At the 1993 evidentiary hearing, Cathi claimed that it was still light outside when she returned to her house but that it was dark when

---

[17] In its order, the trial court noted that "[Dollar] was almost certainly present at the time of the fatal stabbing—either after Cathi left the Stevenson house or after Stevenson returned with Leah King." To the extent the trial court could be construed as suggesting that Dollar was personally present *in the garage* when Hoffman was killed, there is no direct evidence that supports such an inference. Although the record supports a finding that Hoffman was killed while Dollar remained at Stevenson's home, the "mere possibility" that Dollar was also in the garage when Hoffman was fatally stabbed "is nothing more than speculation." (*People v. Ramon* (2009) 175 Cal.App.4th 843, 851.)

[18] Dollar did not object to the admission of the husband's hearsay statement. When reviewing sufficiency of the evidence, we consider all evidence presented at trial. (*People v. Story* (2009) 45 Cal.4th 1282, 1296–1297.)

21

Stelle and Dollar arrived to borrow a car. King estimated that she arrived at Stevenson's house late, between 10:00 p.m. and midnight and that at some point after her arrival she saw what she described as an unconscious and bloody man being covered by a plastic garbage bag. From this sequence of events, it is reasonable to infer that Dollar remained at Stevenson's house until the assailants needed a car to move Hoffman's corpse. (See *People v. Pride* (1992) 3 Cal.4th 195, 245 [jury could make rational inference that defendant was present at scene when murders occurred based on the defendant's work schedule, his car's presence at the scene, and the time of the defendant's arrival back home].)

Finally, the last *Banks* factor is a consideration of Dollar's actions after the lethal force was used. (*Banks*, *supra*, 61 Cal.4th at p. 803.) The evidence showed that rather than aiding Hoffman or exhibiting any reluctance or dismay at his treatment, Dollar procured a car to transport Hoffman's body, stopping to inform Shirley of his good fortune in obtaining a motorcycle, then helped deliver Hoffman's body to a clandestine burial ground. And although Dollar testified at his parole hearing that he had hoped that Hoffman was alive when loaded into the car trunk, his testimony reflected that he made no effort to ascertain Hoffman's condition or seek aid after the fact. (See *In re Harper* (2022) 76 Cal.App.5th 450, 462 [failure to assist victim weighed in favor of finding major participation].)

In attacking the sufficiency of the evidence, Dollar argues that we cannot credit Cathi's testimony, characterizing it as "inherently incredible" and that her "uncorroborated claim" of Dollar's sexual assault of Hoffman "defies logic." But to discount a witness's statements on the basis that they are " 'inherently incredible' " requires " ' " 'either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' " ' " (*People v. Thompson* (2010) 49 Cal.4th 79, 124.) "The only question is: Does it seem *possible* that what the witness claimed to have happened actually happened?" (*People v. Ennis* (2010)

22

190 Cal.App.4th 721, 729.)  Here, Cathi's testimony is not impossible on its face, and neither her motive to incriminate Dollar nor her prior testimony make it so.  Moreover, her testimony can be reconciled with King's, as Cathi described events that took place in the afternoon during daylight hours while King described events that happened later that evening.[19]  Admittedly, Cathi gave conflicting statements in the past, and there is evidence that her testimony may have been motivated by her anger toward Dollar.  But these inconsistencies and attacks on her credibility do not necessarily demonstrate the impossibility or even the falsity of all her statements; the trial court was free to discount these as reflecting only an inability to recall certain events with precision, or a possibility that her testimony exaggerated (rather than willfully falsified) what she had witnessed. (See *Thompson*, at pp. 124–125.)  And a rational trier of fact could have found Cathi's statements to be credible despite any conflicting evidence.  (See *People v. Hovarter* (2008) 44 Cal.4th 983, 997.)[20]

Dollar nonetheless argues that we should discount Cathi's testimony ourselves and that the traditional rationale for finding a fact finder's credibility assessment undisturbed is inapplicable because here, the lower court did not have the opportunity to observe Cathi testify.  Similar arguments have been rejected by other Courts of Appeal, which

---

[19] Dollar notes that the judge presiding over the habeas corpus proceeding found King's testimony "substantially credible."  But what he omits is that the same judge also found King's testimony largely reconcilable with Cathi's, each appearing to describe different segments of the protracted timeline that comprised Hoffman's confinement, assault, and eventual death at Stevenson's house.

[20] Dollar in part argues that it should be noted that the prosecutor did not charge Dollar with sexual offenses or any related special allegations despite Cathi's claim that Dollar took part in beating and sexually assaulting Hoffman.  But even if we could draw inferences about the sufficiency of the evidence from the absence of a charge (cf. *People v. Birks* (1998) 19 Cal.4th 108, 129 ["the prosecution, the traditional charging authority, has broad discretion to base its charging decisions on all the complex considerations pertinent to its law enforcement duties"]), the decision to charge all three defendants with the torture special circumstance defeats Dollar's logic.

23

have consistently held that the substantial evidence standard applies despite a trial court's reliance on a cold record upon review of a petition for resentencing under section 1172.6. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 479–480 (*Oliver*), relying on *People v. Perez* (2018) 4 Cal.5th 1055, 1066 [applying substantial evidence review in § 1170.126 petitions for recall of sentence despite trial court's reliance on record of conviction]; *People v. Njoku* (2023) 95 Cal.App.5th 27, 41–42 [accord].)

"[I]t's unusual to ask the trial judge to sit as the fact finder and (in some cases) make factual determinations on a cold record, as the judge did in this case. While that is not the ideal position for a fact finder, it is possible to review a trial transcript and reach an opinion about what actually happened." (*People v. Clements* (2022) 75 Cal.App.5th 276, 297.) Furthermore, "if either party believes it's important to put on live testimony to allow the trial judge to make credibility determinations based on cues other than consistency and plausibility, the statute expressly allows them that opportunity." (*Ibid.*) And neither party presented live testimony here. When deciding the merits of the petition in this case, the trial judge was required to review the evidence submitted, resolve contradictions in the evidence (if any), and make credibility determinations based on a cold record. (*Id.* at p. 298.) On appeal, our role is not to reweigh credibility assessments already undertaken by the trial court—we must "determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Ibid.*)

Based on our review of the record, we find substantial evidence to support the trial court's conclusion beyond a reasonable doubt that Dollar was a major participant in the underlying felonies.

### b. *Reckless Indifference*

In *Clark*, *supra*, 63 Cal.4th 522, the California Supreme Court addressed the mental state of reckless indifference to human life, holding that it comprises both subjective and objective components. (*Id.* at p. 617; *People v. Emanuel* (2025)

17 Cal.5th 867, 884 (*Emanuel*).) "The subjective element" of reckless indifference "is the defendant's conscious disregard of [known] risks"; its objective element considers "what 'a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617.) " 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*), quoting *Banks, supra*, 61 Cal.4th at p. 808; *Emanuel*, at p. 884.) Factors to be considered—some of which overlap with those examined in *Banks*—include: (1) a defendant's knowledge of weapons, use of weapons, and number of weapons; (2) a defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the crime; (4) a defendant's knowledge of a cohort's likelihood of killing; and (5) a defendant's efforts to minimize the risks of violence during the felony. (*Clark*, at pp. 618–622; *Scoggins*, at p. 677 [applying *Clark* factors].) Like the factors considered in *Banks*, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618.)

The high court in *Clark* acknowledged "the interrelationship" between major participation in an underlying felony and reckless indifference to human life. (*Clark, supra*, 63 Cal.4th at p. 614.) The two requirements significantly overlap, " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Id.* at p. 615.) But these two elements still require individual consideration. (*Id.* at p. 616.)

Like our review of the *Banks* factors, analyzing the *Clark* factors and viewing the evidence in the light most favorable to the conviction, substantial evidence also supports the trial court's determination that Dollar, as a participant in the underlying felony to rob Hoffman of his motorcycle but not the actual killer, acted with reckless indifference to human life. (*Clark, supra*, 63 Cal.4th at pp. 618–622.)

25

As with the *Banks* factors, several of the *Clark* factors likewise do not weigh either for or against a finding of reckless indifference. As we have recognized, there is no direct evidence that Dollar was aware of the presence or intended use of weapons. (*Clark*, *supra*, 63 Cal.4th at p. 618.) But as we have also found, several of the overlapping *Banks* factors still weigh in favor of finding reckless indifference: evidence that suggested Dollar was present at Stevenson's house during the entirety of the criminal activity and the consequent opportunities he had to restrain the other men or seek help for Hoffman, the lengthy duration of the physical and sexual assault against Hoffman, Dollar's knowledge of his cohorts' likelihood of killing, and his failure to minimize the risk of violence during the felony. (*Clark*, at pp. 618–622.)

In part, "[p]roximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps." (*Clark*, *supra*, 63 Cal.4th at p. 619.) As we have explained in addressing the extent of Dollar's participation in the underlying robbery, substantial evidence supports the trial court's conclusion that Dollar was an active participant in physically and sexually abusing Hoffman, in concert with others he knew to be violent. The evidence further supports the trial court's finding that Dollar understood that Hoffman was unlikely to survive the encounter. (Cf. *Emanuel*, *supra*, 17 Cal.5th at p. 887 [fact that robbery was planned in public location during daylight hours where bystanders may be present did not support a finding of reckless indifference].) Hoffman, had he survived, would have been able to both recognize his assailants (who apparently took no measures to conceal their identities) and to locate Stevenson's home (to which Hoffman rode his own motorcycle, if unwillingly). The protracted assault in the seclusion of the garage made it unlikely that Stevenson and the others would have contemplated allowing Hoffman to survive not only the robbery and kidnapping but the beating and rape. The trial court could properly conclude that Dollar, having admittedly "dealt with people like that all [his] life," would have been well aware of this reality.

26

We recognize that Dollar's physical presence at the scene and his opportunity to minimize any risk of violence does not mean it was "incumbent on [him] to actually prevent the violence or attempt to do so by any means necessary." (*Emanuel*, *supra*, 17 Cal.5th at p. 891.) The ultimate question is whether Dollar's *actions* or *inactions* shed light on whether he acted with the mens rea of reckless indifference to human life. (*Ibid*.) But here, Cathi's testimony, credited by the trial court, suggested that Dollar was not merely present at the crime but was an active participant in the assault. "Where a victim is . . . kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620; *Emanuel*, at p. 886.) This was not a case in which Dollar "had no meaningful opportunity to aid" Hoffman before Hoffman's death." (*Emanuel*, at p. 894.) "Where a defendant is aware of the risk of impending lethal violence, he or she may opt to aid the victims—for example, by permitting them to flee—rather than attempt to restrain his or her coperpetrator." (*Ibid*. [deeming relevant that "there was no prolonged period of restraint" in which defendant failed to render aid].) We recognize that the assault and rape in the garage relied solely on Cathi's testimony, but "[e]ven when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the [substantial evidence] standard is sufficient to uphold the finding." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

Furthermore, "[a] defendant's actions after the [killing] may also bear on the defendant's mental state." (*Scoggins*, *supra*, 9 Cal.5th at p. 679.) "However contemptable we may find a defendant's conduct following a killing, the governing standard is not satisfied by evidence that the defendant was generally indifferent to the fact that someone *has been* killed; it requires evidence that, at the time of the [killing], the defendant acted with indifference toward the grave risk that someone *could be* killed." (*Emanuel*, *supra*, 17 Cal.5th at p. 895.) There was evidence that after Hoffman was

27

killed, Dollar neither fled nor sought aid. Instead, he transported Hoffman's body to the woods and excitedly confided to Shirley that he now had a motorcycle. (See *People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [noting that the defendant's "immediate reaction to the violence did not include remorse"]; but see *In re Taylor* (2019) 34 Cal.App.5th 543, 560 [callous indifference toward a victim's death not necessarily indicative of reckless indifference to human life].) Standing alone, Dollar's postcrime conduct would be insufficient. (*Emanuel*, at pp. 893–894.) But his postcrime conduct bolsters the inference of reckless indifference raised by his participation in the assault and rape, his knowledge of Stevenson's propensity for violence, and his threat to Cathi implying he knew that Hoffman would not survive his continued confinement in the garage.

To have possessed reckless indifference to human life, "[a]wareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Banks*, *supra*, 61 Cal.4th at p. 808.) And here, there is evidence that Dollar was aware that there was more than the foreseeable risk of death inherent in a physical or sexual assault or robbery. For these reasons, we find sufficient evidence supports the trial court's conclusion that Dollar acted with reckless indifference to human life.

### c. *Conclusion*

Whether Dollar was a major participant who acted with reckless indifference to human life "is predominantly a factual question reviewable for substantial evidence." (*Oliver*, *supra*, 90 Cal.App.5th at p. 480.) Although we have disagreed with some of the trial court's more liberal factual inferences, these granular factual determinations were one of *many* factual determinations the trial court made in its evaluation of the *Banks* and *Clark* factors. And a testimony of a single witness—including Cathi—is sufficient to prove any fact. (*People v. Avila* (2009) 46 Cal.4th 680, 703.) Dollar's substantial evidence argument is largely focused on what he perceives as defects in the trial court's reasoning and the inferences that the trial court made from the evidence. But in

reviewing the sufficiency of the evidence, we must affirm the trial court's decision " ' "even if other substantial evidence would have supported a different result." ' " (*People v. Jason K.* (2010) 188 Cal.App.4th 1545, 1553.) We must also weigh the evidence in the light most favorable to the judgment. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658.) And on this record, construing the evidence in favor of the judgment, we find that the totality of the circumstances supports a finding that Dollar was guilty of felony murder as a major participant who acted with reckless indifference to human life.[21] (See *Scoggins*, *supra*, 9 Cal.5th at p. 683 [a defendant's culpability is a fact-intensive, individualized inquiry].)

## B.    *Existence of Judicial Bias*

Dollar's final argument is that the trial court's conclusions should not be entitled to deference because the trial court failed to ask a single substantive question during the parties' lengthy arguments and the court's 37-page written order was copied largely verbatim from the prosecutor's 38-page section 1172.6 brief. Dollar insists that the line-by-line copying of the prosecutor's brief—which he points out includes the trial court's incorporation of typographical errors and grammatical mistakes from the prosecution's brief—demonstrates that the trial court failed to independently evaluate the facts and thereby deprived him of due process of law. Upon closer examination of the trial court's order, we disagree that bias has been shown.

Dollar argues that he was deprived of his due process right to a fair and impartial judge, as demonstrated by the court's order. But "[i]t is 'extraordinary' for an appellate court to find judicial bias amounting to a due process violation." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589; see also *People v. Peoples* (2016) 62 Cal.4th 718, 788 (*Peoples*).) In assessing judicial bias, "[t]he [c]ourt asks not whether a judge harbors

---

[21] We therefore need not reach the alternate basis for the trial court's ruling, that Dollar directly aided and abetted murder.

29

an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is "likely" to be neutral, or whether there is an unconstitutional "potential for bias." ' " (*Williams v. Pennsylvania* (2016) 579 U.S. 1, 8.) " '[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient.' " (*Peoples*, at p. 788.) On appeal, the question is "whether any judicial misconduct or bias was so prejudicial that it deprived defendant of ' "a fair, as opposed to a perfect, trial." ' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112 (*Guerra*), overruled on a different ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

We recognize that the trial court largely adopted the language of the prosecutor's trial brief in its eventual order denying the section 1172.6 petition. But the trial court was not required to issue a written order when denying the section 1172.6 petition. And given the length and complexity of the record (the admitted prior testimony comprised approximately 6,000 pages from the trial and another 2,000 pages from the habeas corpus petition), the trial court's use of the prosecutor's recitation of facts can be reasonably attributed to the court's agreement that the prosecutor had accurately summarized the transcript and to the court's desire to maximize judicial efficiency.[22] As a general rule, we must presume that the trial court performed its duties and followed applicable law. (Evid. Code, § 664; *People v. Ramirez* (2021) 10 Cal.5th 983, 1042.) The trial court presumably did so—in fact, the written order adds record cites that were absent from the prosecutor's trial brief and corrects others that were included in error, showing that the trial court independently examined the record.[23] And to the contrary, there is no

_____

[22] In the civil context, it is not uncommon for trial courts to ask a party to prepare a proposed statement of decision that the court may later adopt. (See Cal. Rules of Court, rule 3.1590(f).)

[23] In the prosecutor's trial brief, for example, the prosecutor summarized—without citation to the record—that Cathi was 18 years old and had recently married Dollar and

affirmative evidence from the record that contravenes the presumption that the trial court performed its duties or that it failed to independently weigh and consider the evidence as presented.

Even the court's more speculative inferences do not persuade us that the court was " ' "allying [itself] with the prosecution." ' " (*People v. Harris* (2005) 37 Cal.4th 310, 347.) The court did not " ' "officiously and unnecessarily usurp[] the duties of the prosecutor." ' " (*Ibid.*). Rather, the court's order demonstrated its agreement with the prosecutor's recitation of the facts and analysis of the evidence, informed by the court's independent review of the record. Dollar argues that no fair-minded jurist would adopt as factual conclusion that "[Dollar] was almost certainly present at the time of the fatal stabbing," an assertion made in the prosecutor's trial brief and adopted in the trial court's order. But without more, erroneous rulings against a party do not establish judicial bias. (*Guerra*, *supra*, 37 Cal.4th at p. 1112.) So too here, even if certain of the trial court's factual findings overstate the available inferences from record evidence, these errors do not establish judicial bias.

### III. DISPOSITION

The judgment is affirmed.

---

were living with their parents in San Jose in 1978. But for the identical sentence in the order, the trial court supplied correct citations to the reporter's transcript of Cathi's testimony relating these facts. And in other instances, the trial court accurately cited different pages of the record to support the same facts the prosecution located elsewhere. And in the prosecutor's trial brief, the prosecutor initially provided citations to pages 4851 and 4998 of the reporter's transcript for the assertion that Cathi's stepfather manufactured methamphetamine and sold it from his house, but the trial court corrected the page citations in its order to pages 4852 through 4853 and 4998 of the reporter's transcript.

_____

LIE, J.

WE CONCUR:

_____

DANNER, Acting P. J.

_____

BROMBERG, J.

*People v. Dollar*
H050414